IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **RICHARD BERNARD MOORE** | ) |
| *Petitioner*, | ) C/A No. 4:14-cv-4691-MGL-TER |
| | ) |
| v. | ) **DEATH PENALTY CASE** |
| | ) |
| **BRYAN P. STIRLING,** Commissioner, | ) |
| South Carolina Department of | ) |
| Corrections, and **JOSEPH MCFADDEN**, | ) |
| Warden of Lieber Correctional Institution | ) |
| *Respondents*. | ) |

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY (VERIFIED)**

1.  (a)  Richard Bernard Moore was convicted and sentenced in the Spartanburg County Court of General Sessions in South Carolina.

    (b)  Spartanburg County Case No. 00-GS-42-617-619.

2.  Petitioner was convicted on October 21, 2001, and sentenced on October 22, 2001.

3.  Petitioner was sentenced to death.

4.  Petitioner was convicted of more than one offense.

5.  Petitioner was convicted of one count of each of the following offenses: murder; assault with intent to kill; armed robbery; and possession of a firearm during the commission of a violent crime.

6.  (a)  Petitioner pled not guilty.

    (b)  Not applicable.

    (c)  Petitioner was tried by a jury.

7.  Petitioner did not testify at trial or during a post-trial hearing. Petitioner did testify during a post-conviction relief hearing in state court.

8.  Petitioner appealed his convictions and sentence.

9.    (a)    The Courts to which Petitioner appealed:
             (i)    The South Carolina Supreme Court

      (b)    The case number:
             (i)    Opinion No. 25786

      (c)    The result in each Court to which Petitioner appealed:
             (i)    Convictions and death sentence affirmed

      (d)    Date of each result:
             (i)    Convictions and death sentence affirmed on March 1, 2004.

      (e)    Citations to the cases:
             (i)    *State v. Moore*, 357 S.C. 458, 593 S.E.2d 608 (2004)

      (f)    Grounds raised:
             (i)    Petitioner raised the following grounds on direct appeal:

             1.    The [trial] judge erred during the guilt phase by preventing Moore from stressing the gravity of the decision facing the jury by arguing, "The State is seeking the death penalty on me, which means my very life is at stake." The judge abused his discretion by ruling that Moore could not mention punishment, but was limited solely to a discussion of "the testimony and evidence that has been presented."

             2.    The [trial] judge erred during the sentencing phase by once again limiting Moore's closing argument "to the evidence that has been presented and to the issues concerning the sentence imposed." Since S.C. Code Sections 16-3-20(C) and 16-3-28 afford a capital defendant the opportunity to ask for mercy and express feelings of remorse, this arbitrary limitation was an abuse of discretion and rendered Moore's purported waiver of closing argument involuntary.

      (g)    Petitioner did not seek further review by a higher state court because no such higher state court exists.

      (h)    Petitioner did not file a petition for certiorari in the Unites States Supreme Court.

10.   Other than the direct appeal, Petitioner has sought relief through one application for post-conviction relief in the state courts of South Carolina.

11.   (a)    (1)    Petitioner filed an application for post-conviction relief in the Spartanburg County Court of Common Pleas.

             (2)    Spartanburg County Court of Common Pleas Case No. 2004-CP-42-2715.

(3)    An initial application for post-conviction relief was filed on August 8, 2004. A first amended application for post-conviction relief was filed on December 31, 2010; and a supplemental amendment to the application for post-conviction relief was filed on January 5, 2011.

(4)    Petitioner sought post-conviction relief through filing an application for post-conviction relief.

(5)    Petitioner raised the following grounds in his amended application for post-conviction relief and supplemental amendment to the application for post-conviction relief:

9 & 10 (a) Trial counsel was ineffective in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and federal laws, South Carolina Constitution and South Carolina state law due to counsel's failure to object to the trial court's erroneous limitation on Applicant's right to allocution/right to address his jury at the end of the penalty phase and/or make a plea for mercy during his penalty phase closing statement. Counsel's failure to object to the trial court's improper admonition to Applicant deprived Applicant of the fundamentally important right to seek mercy from his sentencing jury and prevented review of this issue on direct appeal. *State v. Perez*, 334 S.C. 563, 514 S.E.2d 754 (1999); *State v. Hall*, 312 S.C. 95, 439 S.E.2d 278 (1994).

9 & 10 (b) Trial counsel was ineffective in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and federal laws, South Carolina Constitution and South Carolina state law due to their failure to perform a reasonable investigation into Applicant's background and family life resulting in a sentencing proceeding that was fundamentally unfair and assured a death verdict for the Applicant would be returned by the jury. Trial counsel failed to conduct any investigation in the state of Michigan, where the Applicant was born and raised. Had counsel conducted a reasonable investigation into Applicant's background, they would have learned that Applicant comes from a large family, had numerous relatives who could have testified to his good character and struggle with addiction, and these relatives and/or friends would have been willing to testify on Applicant's behalf during his sentencing proceeding at trial. Failure to conduct a reasonable investigation into potential avenues of mitigation is conduct falling below what is required of trial counsel in a capital case. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland v. Washington*, 466 U.S. 668 (1984) ('counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" *Id.*, 466 U.S. at 691); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

3

9 & 10 (c) Trial counsel was ineffective in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and federal laws, South Carolina Constitution and South Carolina state law in that trial counsel failed to properly and adequately investigate and prepare to confront and rebut the State's alleged physical evidence, and further trial counsel failed to present its own expert or evidence to rebut or explain such physical evidence and/or object that ballistics and firearms and serology testimony was inadmissible in that it failed to meet the mandates of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *State v. Jones*, 273 S.C. 723 (1979). Counsel's unreasonable omissions denied Applicant an opportunity to show the jury he acted in self-defense or [*sic*]

This incident involved a late night shoot out in a convenience store. Multiple gun shots involving two guns were fired. The defendant was wounded in the arm and chest and the victim was mortally wounded. There is undisputed evidence that the victim owned and/or possessed both guns involved and no evidence the defendant possessed any gun until he wrestled one of the guns away from the victim. There was a great deal of evidence and testimony presented by the Solicitor regarding multiple guns, ballistics, shell casings, bullet jackets, bullet fragments, finger prints, trace evidence, guns shot [*sic*] residue, blood, blood spatter, DNA, and pathology. Much of this evidence is subject to attack on the basis of its questionable admissibility. Even if admissible, the evidence was easily contradicted and/or explained in a manner consistent with "circumstances oher than the guilt of the accused." Trial counsel never retained its own expert to assist with forensic issues involved with the State's physical evidence. Trial counsel never called as witnesses its own experts for the jury to hear an opposing view and opinion as to the physical evidence. Thus, trial counsel did not adequately investigate or prepare to deny, rebut, or explain the State's physical evidence. *Gardner v. Florida*, 430 U.S. 122, 50 L.Ed.2d 339, 97 S. Ct. 399 (1976). Had counsel hired appropriate forensic experts, including a forensic pathologist, who could have testified as to the single bullet having killed James Mahoney, rather than two as opined by the state, and a crime scene analyst who could have provided testimony concerning the likely origin of bullets, bullet fragments, shell casings, and general crime scene analysis, there is a reasonable probability that the guilt and/or penalty phase would have had a different outcome. *Strickland v. Washington, supra.*

9 & 10 (d) Applicant was denied due process of law and also denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, the South Carolina Constitution and South Carolina law because the State failed to disclose material evidence to the defense concerning State's witness George Gibson. *Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, if counsel was aware of all of the information set forth below about George Gibson, then trial counsel acted unreasonably in not cross-examining Gibson as to his pending

4

charges and/or investigating the other witnesses at Gibson's home the night of the incident. *Strickland v. Washington,* infra. [*sic*]

George Gibson, a State witness had told detectives immediately after the shootings, in 1999, that Applicant came to Gibson's home and asked him for a ride to the hospital, which Gibson refused to do. On October 18, 2011, the first day of trial, defense counsel told the Court that the State now had an additional statement from Gibson. This new statement had been provided to counsel the previous week in a summary of supplemental aggravating circumstances notice. Gibson's new statement said that defendant robbed and murdered the store clerk in order to buy cocaine, and that was why Applicant showed up at Gibson's home after the shooting. Although other witnesses were at Gibson's residence on the night of the incident at the time of Moore's visit there, and had talked to law enforcement, defense counsel was either unaware of these other witnesses, which the state failed to name or take statements from, or had not been able to locate or interview them before trial.

Additionally, defense counsel was not informed that, at the time of his testimony, George Gibson was incarcerated at Allendale Correctional Institution and was brought to Spartanburg to testify at the solicitor's direction. Defense counsel was never told that Mr. Gibson was also out on bond for the then-new (July 2001) possession of crack arrest (although counsel had been informed of Gibson's 2000 Trafficking Crack charge that was pending in the 7th Circuit). Assuming, *arguendo*, that the State did provide the above information to the defense about Mr. Gibson, then counsel failed to adequately investigate this matter. Impeachment evidence related to a critical witness, such as George Gibson, whose testimony formed the centerpiece/lynchpin of the state's case against Applicant, and whose second statement to law enforcement, given at the eleventh hour, became the basis for *res gestae* testimony, that was used to prove a sketchy, yet overwhelmingly prejudicial, "motive" and should have been disclosed to defense counsel. George Gibson had substantial charges for which he faced significant prison time, which fact, had it been known to the jury, would certainly have cast doubt on Gibson's credibility. *State v. Mizzell*, 394 S.C. 326 (2002). The State's nondisclosure of critical impeachment evidence against its star witness undermines any confidence that can be had in the jury's guilt and/or sentencing verdict(s). *Brady v. Maryland*, *supra*; *Strickland v. Washington*, *supra*.

9 & 10(e) Applicant was denied due process of law and also denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, the South Carolina Constitution and South Carolina law because trial counsel failed to pursue their *Batson . Kentucky*, 476 U.S. 79 (1986) claim, despite the fact that Applicant's jury was exclusively white and the state struck the only two

African-Americans qualified to serve as jurors. Applicant is African-American and the alleged victim, James Mahoney, was Caucasian. The State's decision to strike the only two qualified African-American jurors on the jury panel established a prima facie case of racial discrimination. Trial Counsel raised a *Batson* challenge, but later abandoned it. (Tr. P. 1137). Trial Counsel's failure to pursue and/or preserve for direct appeal a *Batson* challenge was unreasonable, as the State's alleged race-neutral reasons for striking jurors Morrow and Huffman were pre-textual, as white jurors who gave almost mirror like responses and/or were similarly—if not exactly—situated insofar as having relatives who were prosecuted, were not challenged by the State and were seated on Applicant's jury. Counsel's failure to preserve this meritorious issue was deficient and unreasonable, as well as prejudicial. *Strickland v. Washington*, *supra*.

9 & 10(f) Applicant was denied due process of the law and also denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, the South Carolina Constitution and South Carolina law because trial counsel failed to preserve their objection to the trial court's refusal to give a jury instruction on voluntary manslaughter. Assuming, *arguendo*, that the issue of the trial judge failing to give a voluntary manslaughter charge was properly preserved, appellate counsel was ineffective in failing to raise this issue on direct appeal. Applicant was entitled to a charge of voluntary manslaughter based on the facts of his case. It is undisputed that Applicant was shot by James Mahone and he was shot by a weapon owned by either James Mahoney or the owner of Nikki's Convenience Store. James Mahoney's death was likewise the result of being shot with his own weapon. The fact that all three firearms collected from the crime scene in and near Nikki's Convenience Store belonged to either Mahoney or the store owner establishes that: (1) Applicant entered the store without a firearm and (2) that James Mahoney initiated what later became a deadly gun fight.

Voluntary manslaughter is a lesser-included offense of murder. Voluntary manslaughter is defined as an "unlawful killing of a human being in the sudden heat of passion upon sufficient legal provocation." *State v. Cole*, 388 S.C. 97 (2000). The only time a voluntary manslaughter charge should not be provided to the jury is when there is "no evidence whatsoever tending to reduce murder to voluntary manslaughter." *State v. Pittman*, 373 S.C. 527 (2007). In Applicant's case, there was ample evidence that Mahoney was killed as a result of a gun battle he initiated with a weapon that did not belong to Applicant. These facts alone establish sufficient provocation by Mahoney to entitle Applicant to a charge on voluntary manslaughter.

Trial counsel's failure to preserve this issue or, alternatively, appellate counsel's failure to raise it on direct appeal amounts to ineffective assistance of counsel. *Strickland v. Washington*, *supra*.

6

9 & 10(g) Applicant was denied due process of the law and also denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, the South Carolina Constitution and South Carolina law because trial counsel failed to present adaptability evidence from James Aiken, a nationally recognized expert in the field of penal institution safety and management. Mr. Aiken was prepared and available to testify on behalf of Applicant, but never called as a witness. Counsel's unreasonable decision not to call Mr. Aiken opened the door for the state's damning closing argument that Applicant had shown "escalating violence," thereby injecting the fear of Applicant's future dangerousness into the minds of the jurors, who were never told that Applicant could be safely housed for the duration of his life. The prejudice to Applicant stemming from counsel's inexplicable (and seemingly eleventh hour) decision to discard the only defense expert is manifest. *Strickland v. Washington*, *supra*.

9 & 10(h) Applicant was denied due process of the law and also denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, the South Carolina Constitution and South Carolina law because trial counsel failed to request a charge on the statutory mitigating circumstance of provocation by the victim, as set forth in S.C. Code Section 16-3-20(c)(b)(8). Failure to request this mitigating circumstance was both deficient and prejudicial to Applicant. Counsel argued to the jury that Applicant was also a "victim," so there is no conceivable professionally reasonable basis for not seeking instruction to the jury that the victim's provocation could be considered by them as a factor in mitigation of punishment. Without such an instruction, the jury was left with no guidance to assist them in taking into consideration the fact that Mahoney shot applicant, which was the whole basis of counsel's argument that Applicant was a victim, too. Trial counsel's failure to request the statutory mitigator of provocation by the victim was ineffective assistance of counsel. *Strickland v. Washington*, *supra*.

9 & 10(i) Trial counsel was ineffective in failing to object to the State's request to charge the statutory aggravating circumstance found in S.C. Code Section 16-3-20(c)[(a)](3) because it was not appropriate to the facts of Applicant's case. Alternatively, if the trial court correctly held that SC. Code Section 16-3-20(c)[(a)](3) is properly applied to the facts of Applicant's case, then this code section is unconstitutional due to its over-breadth, in that it fails to sufficiently narrow the class of offenders who are eligible for a death sentence.

South Carolina Code Section 16-3-20(c)[(a)](3) reads as follows: The Offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives of more than one person.

7

Applicant's case involved use of a pistol. A pistol is not "a weapon or device which normally would be hazardous to the lives of more than one person." Alternatively, if a singly-shot pistol meets the criteria of 16-3-20(c)[(a)](3), then this aggravating factor would make any non-residential intentional shooting death occurring near a third-party eligible for the death penalty. Clearly, this is not what the legislature intended. The more reasonable construction of 16-3-20(c)[(a)](3) is to apply it in those few cases where an incendiary device, bomb or other explosive type of weapon is used to kill people in a public place. To hold otherwise would violate the basic Eighth Amendment principle that death penalty statutes must sufficiently narrow the class of death-eligible offenders.

Applicant either received ineffective assistance of counsel or S.C. Code Section 16-3-20(c)[(a)](3) is unconstitutional. *Strickland v. Washington, supra, Lewis v. Jeffers*, 497 U.S. 764, 774 (1990.

9 & 10(j) [Applicant] was denied the right to effective assistance of appellate counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution during the appellate proceedings when appellate counsel failed to raise on appeal the trial court's error in admitting the testimony of State's witnesses George Gibson and Jeanie Smith as res gestae witnesses. These witnesses should not have been admitted under a res gestae theory and, as such, the probative value of such testimony was substantially outweighed by it[]s prejudicial nature.

9 & 10(k) [Applicant] was denied the right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution in that trial counsel failed to object to the admission of testimony by State's witnesses Jeanie Smith in that such testimony was inadmissible hearsay.

(6) An evidentiary hearing was convened on January 31, 2011.

(7)/(8) The application for post-conviction relief was denied August 1, 2011.

(b)    Petitioner has not filed a second petition, application, or motion.

(c)    Petitioner has not filed a third petition, application, or motion.

(d)    (1)    Petitioner appealed the denial of his application for post-conviction relief to the South Carolina Supreme Court.

(2)    Not applicable.

(3)    Not applicable.

(e)    Not applicable.

12.    **GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF.**

**Relevant Background Information[1]**

Petitioner Richard Moore was convicted of murder, resulting from the shooting death of a Nikki's Speedy Mart ("Nikki's") store clerk in Spartanburg County, South Carolina. It is undisputed that Moore did not enter the store with a gun. App. 1347.[2] At approximately 3:00 a.m. on September 16, 1999, Moore entered the store, walked to the beer cooler, and picked up two cans of beer. *See* App. 1204, 1309. Moore took the cans to the counter and asked the clerk for a pack of cigarettes. *See* App. 1309. The clerk placed the cigarettes with the cans in a paper bag on the counter. *See* App. 1309. Sometime during the course of the transaction, the clerk produced a .45 caliber semiautomatic pistol that was located behind the counter of the store. *See* App. 1347. Moore eventually wrestled the gun away from the clerk and the clerk pulled another gun, a .44 caliber revolver, from the waistband of his pants. *See* App. 1347. Both the clerk and Moore fired the guns and both the clerk and Moore were stuck by at least one bullet. App. 1382. The clerk died. *See* App. 1488. Moore survived and was charged with murder.

Keith Fowler, the husband of the owner of Nikki's, testified at trial that he owned two guns that he kept on the employee side of the counter at Nikki's. App. 1347. He also testified that James Mahoney, the night clerk at the store and the victim in this case, kept his own personal gun

---

[1] This section contains general background information relevant to all of Moore's grounds for relief. Facts that apply only to individual grounds are discussed below within the section addressing the ground.

[2] Citations to App. Refer to the PCR Appendix submitted to the South Carolina Supreme Court with Moore's Petition for Writ of Certiorari seeking review of the denial of post-conviction relief. This Court directed Respondents to file a copy of the entire state court record, which includes the PCR Appendix. *See* Order, ECF No. 17, Dec. 17, 2014. Undersigned counsel have discussed this with counsel for Respondent, who indicated he would file the state court record soon.

9

in the waistband of his pants while he was working his shift at Nikki's.  App. 1348.  Two of these three guns were involved in the incident.

At trial, another patron of Nikki's, Terry Hadden, testified that he was in the store when Moore came in around 3:00 a.m.  App. 1205.  Hadden testified that he was sitting on a stool playing video poker across the store from the clerk's counter.  App. 1205.  Hadden made eye contact with Moore when Moore entered and then turned back to the video poker machine as Moore made his way to the coolers.  App. 1205.  Hadden testified that the next thing he noticed was hearing the clerk say "What the hell are you doing?"  App. 1205.  Hadden turned around and saw Moore holding the clerk's hands with his own.  App. 1206. Hadden testified that Moore turned to him, told him not to move, and fired a shot at him.  App. 1207.  Hadden fell to the floor and did not see anything else that happened until after Moore left the store.  App. 1209.

Moore testified to a different version of events during his post-conviction relief ("PCR") hearing.  Though he did not testify at trial, his trial attorneys agreed Moore had repeatedly told trial counsel the same version of events.  *See* App. 2452, 2633-34.  According to Moore, he attempted to purchase two cans of beer and a pack of cigarettes, totaling a little over $5.00.  App. 2267. Moore only had a $5.00 bill with him and asked if he could use the change in the dish on the counter.  App. 2267.  The clerk told him no and to get out of the store, using racially derogatory language.  App. 2268.  Moore said he was not going anywhere and the clerk pulled a gun from behind the counter.  App. 2268-29.  Moore attempted to get the gun away from the clerk and he gun fired during the struggle toward the video poker machines.  App. 2269.  The clerk then pulled another gun, fired, and struck Moore.  App. 2270.  Moore fired back blindly while hiding behind a barrier between the customer and employee side of the store.  App. 2272.

Evidence at trial showed that, after Moore and the clerk stopped firing at each other, Moore walked around behind the counter and took a bag of money that was sitting on a desk behind the counter. *See* App. 1311, 1352. The bag contained $1408 in cash. App. 1313. Moore then got into his truck and left the store. App. 1211. At some point while he drove, Moore tossed the gun he obtained at Nikki's out the window and continued to the house of a friend named George Gibson. *See* App. 1267. Gibson testified at trial that Moore came up to his door and was bleeding from his wound. App. 1249. Gibson would not let Moore into his house and told him to go to the hospital. App. 1249. Moore made it back to his truck and, as he attempted to back out of the driveway, he hit a pole. App. 1249. By that time, Officer Bobby Rollins arrived at Gibson's home, heard a loud bang, and stopped to see Moore exit the vehicle. App. 1238. Moore surrendered without incident and the money bag from Nikki's was found on the seat of his truck. App. 1239.

Moore was charged with murder, armed robbery, assault with intent to kill, and possession of a firearm during the commission of a violent crime. In the midst of a contentious election campaign for the Seventh Circuit Solicitor's position between incumbent Republican Holman Gossett and Republican challenger Trey Gowdy, the Solicitor's Office notified Moore it intended to seek the death penalty against him. Despite the unaggravated nature of the crime (given the fact that Moore did not enter the building with a gun and reacted to the clerk pulling two guns on him), the case proceeded to a capital trial. Michael Morin, a public defender, and R. Keith Kelly, who had never participated in a capital trial that went to a penalty phase, represented Moore at trial. Morin and Kelly did not challenge the decision to seek the death penalty and presented little challenge to the State's case against Moore.

At the outset of trial, despite the fact that Moore is African American and was charged with the capital murder of a white man, Moore's attorneys asked virtually no *voir dire* questions about

potential racial biases of the potential jurors as allowed by *Turner v. Murray*, 476 U.S. 28 (1986). *See* App 1123. Once their minimal *voir dire* questioning of the potential jurors was complete, the State struck all of the African American jurors. App. 1765. Trial counsel raised but then abandoned a *Batson v. Kentucky*, 476 U.S. 79 (1986), challenge and Moore was tried by an all-white jury. App. 1137, 1765.

In the guilt phase, the State's case hinged mainly on the testimony of Hadden and a ballistics examiner from the State Law Enforcement Division ("SLED"). The ballistics examiner testified that the .45 caliber pistol, the first weapon drawn by the clerk, was fired six times, and the .44 caliber revolver, the second weapon the clerk drew, was fired once. App. 1428. Trial counsel cross examined all of the state witnesses, but the cross examination of the ballistics expert consisted only of clarifying details the witness testified to on direct examination and that the .45 may have ejected an unfired round if it jammed. *See* App. 1432-47. The defense called only one witness during the guilt phase, Stephen Denton, an investigator for the Spartanburg County Sheriff's Office who testified that he sent several items from the store to SLED for fingerprint analysis. App. 1518. The defense did not call Moore to testify and after the defense's virtually nonexistent attempts to contradict the State's physical evidence, the trial judge denied trial counsel's request for a voluntary manslaughter jury charge. App. 1529. The jury found Moore guilty on all counts. App. 1600.

During the penalty phase, the State called witnesses to present victim impact evidence and Moore's criminal history. App. 1618-1675. Trial counsel called only two witnesses during the penalty phase: Moore's common law wife, Lynda Byrd, and her son from a previous relationship, James Byrd. App. 1687, 1699. Their testimony consisted solely of evidence about how Moore tried to contribute to the support of the family and was a good father to his two children with Lynda

and to James.  *See* App. 1695-98, 1699-1703.  Neither Lynda nor James knew about Moore's family or life before the early 1990s when Moore was already an adult.  *See* App. 1688.  The mitigation case, therefore, did not include any information about Moore's childhood, the community where he was raised, or his social history.  The total defense presentation during the penalty phase took up only fifteen pages of transcript.  App. 1688-1703.  After this minimal presentation by the defense, the jury sentenced Moore to death after less than an hour and a half of deliberation.  App. 1754, 1756.

In PCR proceedings, Moore was represented by Lisa Armstrong and James Morton. Armstrong and Morton raised several claims of ineffective assistance of trial counsel.  They alleged trial counsel were ineffective in failing to "properly investigate and prepare to confront and rebut the State's alleged physical evidence, and further trial counsel failed to present its own expert or evidence to rebut or explain such physical evidence." App. 1789.  However, PCR counsel also failed to call their own expert or present evidence to rebut the State's physical evidence. Instead, post-conviction counsel called only Paul Dorman who was a forensic investigator for the Spartanburg County Sheriff's Office.  App. 2186.  Dorman was qualified at the PCR hearing as an expert in crime scene investigation and in fingerprint analysis.  App. 2186. Dorman testified that he believed two bullets were fired from the employee side of the counter toward the customer side of the counter where Moore was standing.  App. 2204, 2207.  The post-conviction relief court denied relief, in part, because Moore did not call a crime scene analysis expert to testify about how trial counsel were ineffective in failing to call a crime scene analysis expert and because Dorman was not qualified to testify to the conclusions he made during PCR.  App. 2906.

PCR counsel also alleged trial counsel were ineffective in failing to "perform a reasonable investigation into Applicant's background and family life."  App. 1789.  PCR counsel traveled to

Michigan and interviewed several of Moore's family members who remembered him as a good child. PCR counsel did not call any of the family members to testify at the PCR hearing, but instead submitted depositions from four of Moore's aunts and uncles and two of Moore's brothers. App. 1798, 1816, 1828, 1841, 1862, 1889. The deposition testimony from the family members was largely cumulative of the original trial mitigation, describing Moore as a good person who was respectful to his family. The family members were not asked detailed questions about Moore's life growing up or about the community in which the family lived. No one has ever presented any testimony regarding Moore's nearly lifelong history of drug addiction and his life growing up in a drug infested neighborhood outside of Detroit, Michigan. The PCR court found trial counsel was not ineffective because "even if [these family members] had been called [to testify at trial], there is no reasonable probability the result of the sentencing proceeding would have been different." App. 2970.

The PCR court denied the remainder of Moore's PCR claims and Moore now comes to this Court, asserting his trial and PCR counsel were ineffective in representing him. As a result of his prior counsel's ineffectiveness, Moore remains on death row for a shooting death when he did not bring either of the weapons involved in the shootout with him and both of the guns were initially pulled by the victim. Moore asks this Court to grant him habeas relief to allow him a trial where the jury is presented with the evidence effective counsel would have uncovered and presented in support of a conviction less than murder and a sentence less than death.

I.    **Moore's Right to the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution was Violated Due to Trial Counsel's Failure to Adequately Investigate and Prepare to Confront and Rebut the State's Physical Evidence.**

The physical evidence presented at trial consisted three guns, shell casings (fired and unfired), spent bullets and bullet jackets, all found at various locations within the store.[3]  After Hadden testified, the State called several witnesses to describe the locations at which the pieces of physical evidence were found.  This testimony combined to demonstrate that the clerk first produced a .45 caliber semiautomatic pistol from behind the counter, Moore eventually got the .45 away from the clerk, and the clerk then produced a .44 caliber revolver from his waistband.  The issues remaining for the jury, therefore, were what prompted the clerk to produce the first weapon, how Moore got the .45 away from the clerk, whether or not shots were fired before Moore gained possession of the .45, and what happened next.

At trial, the State's ballistics expert testified that the .45 was fired six times and the .44 was fired only once.  The expert did not, however, opine on who fired each of the shots from the weapons.  Thus, the jury was left with only Hadden's testimony that the first thing he noticed after Moore approached the counter was that Moore had his hands over the clerk's and turned and fired at Hadden.  *See* App. 1206-07.  Trial counsel did not call an expert of their own and only questioned the State's experts to confirm the locations of various items in evidence and to discuss the functionality of the guns.  *See, e.g.*, App. 1432-47.  By doing so, trial counsel left Hadden's testimony virtually unchallenged.

---

[3] The State also presented evidence that a tire iron and a knife was found at the store, but neither were ever tied to Moore. *See* App. 1202 (testimony of Hadden indicating the tire iron found at the store was the clerk's, which he had provided to another customer who had tire trouble earlier in the night); App. 1518 (testimony of Steve Denton that the knife found at the scene was never sent for fingerprint analysis).

15

Had trial counsel called a crime scene expert, they would have been able to disprove Hadden's testimony and demonstrate that Moore was likely acting in self defense after the clerk pointed a gun at him.  In preparation for the filing of this Petition, Forensic Investigator and Chief Criminal Investigator for the Cobb County, Georgia District Attorney, R. Robert Tressel has reviewed crime scene photos, the reports and testimony of the State's investigators and experts, the trial testimony of Hadden, and Moore's PCR testimony.  Tressel has concluded that Moore's version of events is consistent with, and that Hadden's testimony is contradicted by, the physical evidence.

Hadden's testimony is disproved by the physical evidence because the evidence demonstrates that the first shot was likely fired from the employee side of the counter, not by Moore in front of the counter.  Tressel's investigation determined that a fired shell casing from the .45 was found behind the employee side of the counter under the corner of a counter along the far wall of the store.  The .45 caliber pistol ejected fired shell casings upwards, to the right, and to the rear.  Given the direction of the ejection, it is unlikely that Moore could have fired the .45 from the customer side of the counter toward Hadden as Hadden testified at trial.  Instead, the location of the spent shell casing is more consistent with either the clerk firing toward the customer side of the counter and the video poker machines or with Moore's testimony that he and the clerk struggled over the .45 that fired during the struggle.  Either way, Hadden's testimony that Moore had the gun away from the clerk and fired the first shot at him is unsupported by the physical evidence. *See* App. 1207 (confirming with Hadden that the first shot he heard was the shot directed toward him).

Tressel also agreed with forensic pathologist, Dr. Sandra Conradi's PCR testimony that the shot that hit the clerk would have resulted in the clerk falling to the ground almost immediately

and becoming unconscious quickly. *See* App. 2329. Tressel also found that the shot shattered a bone in the clerk's right arm, making it impossible for him to fire another shot with his right hand after he was struck. This demonstrates that the clerk must have fired the shot that hit Moore before Moore fired the shot that hit the clerk.

Had trial counsel presented this evidence at trial, Hadden's credibility would have been called into question and there would have been sufficient evidence for the judge to charge the jury with a lesser included offense of voluntary manslaughter. Trial counsel agreed during the PCR hearing that "[t]he best thing to do during the guilt phase was to attack the credibility of the witnesses . . . and attempt to use their witnesses to create a situation where perhaps there was a legal provocation and he acted in a sudden heat of passion. Therefore, that would of gotten us a manslaughter charge." App. 2546-47. Morin noted that "with the victim providing all of the weapons that resulted in the shooting, that might have been a[] good argument." App. 2547. Given that trial counsel's goal was to obtain a manslaughter charge and challeng Hadden's testimony, they were ineffective in failing to adequately challenge the State's evidence by using an expert of their own who could have provided support for Moore's consistent statements that he acted in self-defense. Had trial counsel used their own expert to confront the State's evidence, there would certainly have been enough evidence to charge the jury on voluntary manslaughter and self-defense and for the jury to find Moore guilty of a non-capital offense less than murder. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (finding trial counsel ineffective for failing to hire an adequate expert to consult and testify regarding ballistics evidence).

II. **Moore's Right to the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution was Violated Due to Trial Counsel's Failure to Adequately *Voir Dire* the Potential Jurors Before Making Challenges for Cause and Exercising Peremptory Challenges.**

A criminal defendant has a constitutional right to an impartial jury that is both "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Encompassed in the right to an impartial jury is the defendant's right to an adequate *voir dire*. An adequate *voir dire* identifies unqualified or potentially biased jurors. *See Morgan v. Illinois*, 504 U.S. 719, 735-36 (1992).

The *voir dire* conducted by Moore's trial attorneys was cursory and brief. In many instances, potential jurors answered questions indicating they might not be qualified to serve as jurors or that they would harbor biases in against Moore and trial counsel failed to follow up on those answers. Trial counsel's failure to adequately *voir dire* the potential jurors left him with a jury that could not be impartial and included individuals who would automatically vote for the death penalty upon finding him guilty and who were likely to identify with the victim of the crime.

1. *Trial counsel were ineffective in failing to adequately* voir dire *jurors on their beliefs regarding the death penalty, resulting in seated jurors who would automatically impose a death sentence upon a finding that Moore was guilty of murder.*

Undersigned counsel's investigation revealed that multiple individuals sitting on Moore's jury believed a death sentence was appropriate solely based on a finding that Moore was guilty of murder, without consideration of the evidence presented in the sentencing phase. In *Morgan*, the Supreme Court found capital jurors who would "automatically vote for the death penalty in every case" unqualified to serve. *Id.* at 729. The Court stated that these automatic death penalty jurors violate the impartiality requirement in the Due Process Clause of the Fourteenth Amendment. *See id.* Moreover, the Court maintained that jurors who believed the death penalty to be the only appropriate sentence for certain crimes were unqualified to serve because they have formed an

opinion regarding the merits of the case without basis in the evidence developed at trial. *See id*. at 729, 735, 738-39.  Thus, any juror who would fail to properly consider all of the defendant's mitigating evidence, even if they would not necessarily vote for death in every case, must be excluded.  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 247 (2007) ("[O]ur cases ha[ve] firmly established that sentencing juries must be able to give meaningful consideration and effect to *all* mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.") (emphasis added).  The inclusion of even one juror who cannot properly consider mitigating evidence violates a capital defendant's right to a fair trial before an impartial jury.  *See Morgan*, 504 U.S. at 734 n.8.

During *voir dire*, the eventual jury foreperson Karen Nave (now Sweet) responded to a question asking to what she attributes her views on the death penalty, stating "I guess just to what I believe is, you know just right and wrong. . . . You really have to just pay for your actions, the consequences of your actions." App. 503.  Trial counsel should have questioned Juror Nave about what she considers "right and wrong" and what she meant when she said, "you really have to pay for the consequences of your actions."  Without further questioning, trial counsel was unable to uncover the fact that these responses actually indicated she would automatically vote for the death penalty in the event that Moore was found guilty.  In an interview conducted with Juror Nave, she identified herself as an advocate of "and eye for an eye."  William Miller Aff. ¶ 2 (attached as Exhibit A). She stated that she did not vote for a life sentence for Moore because this was not a case of "self-defense or an accident."  *Id.*  Had trial counsel obtained this answer during *voir dire*, the court would have excused her for cause as a juror who would automatically impose a death sentence.  Her statement that she selected the death sentence because this was not a case of self-

defense or an accident demonstrates her inability to consider the facts of the case because a finding of self-defense of accident must be ruled out in order to convict a defendant of murder[4] during the guilt phase.  Therefore, her decision during the guilt phase to find Moore guilty of murder ruled out her only two considerations in deciding on the death penalty.  She was thus unable to consider evidence presented during the penalty phase and would have been stricken for cause had trial counsel asked adequate questions to determine her true beliefs on the death penalty.

Similarly, Juror Walter Ballard would have been stricken for cause had there been a constitutional *voir dire*.  During *voir dire*, Juror Ballard stated he attributed his views on the death penalty to his Baptism and his upbringing.  App. 549.  Trial counsel did not follow up on his views to uncover potential bias.  During a later interview, Juror Ballard revealed that he believed in automatically imposing the death penalty in a murder case, and that he was not willing to consider mitigating evidence.  Although Juror Ballard admitted that he did not believe that Moore intended to kill the victim, he stated that he felt that death was the appropriate punishment as soon as Moore admitted to being involved in the altercation with the victim.   Agbeko Petty Aff. ¶ 2 (Attached as Exhibit B).  Juror Ballard stated that he felt that the death penalty "[was not] used often enough" and that he "would have put the bullet in [Petitioner's] head . . . if the victim had been [Ballard's] brother."  *Id.*  Juror Ballard's statements clearly demonstrate that he was not willing to consider mitigating evidence in determining whether or not the death penalty was appropriate.  Had trial counsel probed further into Juror Ballard's views on the death penalty, Juror Ballard would have been found unqualified under *Morgan* and would have been removed for cause.[5]

---

[4] A conviction of murder requires proof of malice.  S. C. Code § 16-3-20 (defining "murder" as "the killing of any person with malice aforethought, either express or implied.").

[5] Review of the *voir dire* of other jurors reveals additional deficiencies in trial counsel's *voir dire* questioning. Juror Doris Robertson's *voir dire* answers revealed a belief that in some situations, a

Moreover, trial counsel must be able to make informed challenges during jury selection in order to ensure the right to an impartial jury. Here, counsel not only failed to probe veniremen regarding potential bias about the death penalty, but also failed to elicit useful answers to base an intelligent decision to accept or challenge prospective jurors. Counsel's omission made it more likely that the jurors who did serve were partial and resulted in the seating of two jurors who have admitted they would automatically vote for death upon a finding of guilt—Jurors Karen Nave and Walter Ballard. Counsel's failure to further question these jurors not only prevented counsel from uncovering bias regarding the death penalty, but also prevented counsel from making an intelligent decision whether to accept or challenge prospective jurors. Counsel's failure to properly inquire about potential bias or elicit useful information to accept or challenge prospective jurors was ineffective under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

2. *Trial counsel were ineffective in failing to adequately* voir dire *two jurors whose past experiences tended to show that they would sympathize with the victim.*

---

death sentence should follow directly from a murder conviction. App. 399. During *voir dire*, trial counsel asked Juror Robertson if she previously thought about the death penalty. App. ___. She replied "Not a whole lot. I guess from my rearing back when, you know, the death penalty was, you know, *if you are guilty you get the death penalty in a murder*. But in extenuating circumstances, I would have to hear the evidence." App. 399 (emphasis added). Rather than asking Juror Robertson to clarify her response, trial counsel moved on. App. 399. Juror Robertson was aware that there are two sentencing options if a defendant is found guilty—life in prison or death. App. 393. However, her statements indicated that absent "extenuating circumstances," she would not consider any additional evidence and would automatically vote to impose death if a defendant is guilty and indicated that in most cases, she would form an opinion on sentencing without considering mitigating evidence. Likewise, Juror Sandra Taylor's responses suggested she believes certain crimes automatically warrant the death penalty. App. 847. When asked by trial counsel about her views on the death penalty, Juror Taylor answered "I think certain circumstances that that is needed, but I also, from my religious bringing up, I have, I guess, reserved feeling also. So, but I feel like I could, you know, do that if it came to that." App. 847-48. Her responses indicate that in at least some circumstances, she would automatically impose a death sentence, regardless of the individual circumstances or mitigating evidence in a case warranting further questioning from trial counsel. Trial counsel should have further questioned both jurors to determine what circumstances, if any, trigger an automatic death sentence.

Trial counsel did not remove two jurors who shared personal and professional experiences with the victim of the crime.  When a juror's experience is closely related to the experience of the victim of an offense, there is a significant possibility that the juror will be unable to be impartial. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (noting that the Witherspoon standard "does not require that a juror's bias be proved with "unmistakable clarity'").  Thus, it is proper to exclude jurors who are similarly situated to the victims of the crime because their sensitivity may render them unable to impartially evaluate the evidence presented at trial.

Juror Jeffery Blanchard was a grocery store clerk and may have been sensitive to the underlying crime because he was robbed at gunpoint while working at the grocery store.  App. 303.  Trial counsel did not ask Juror Blanchard whether his past employment would affect his deliberation in Moore's case despite the fact that Moore was charged with the robbery and murder of a store clerk.  As a prior store clerk who experienced an armed robbery, Juror Blanchard most likely felt some sense of sympathy and understanding for the victim of this crime.  Furthermore, trial counsel, in light of these responses, had a duty to inquire further about whether Juror Blanchard's prior occupation as a store clerk would affect his deliberations. The presence of even one impartial juror denies a defendant the right to a fair trial. *See Morgan*, 504 U.S. at 734 n.8.

Similarly, as a child, Juror Michael Garner was a witness in a criminal case.  Juror Garner described the incident:

> Garner:    My mother was attacked by a boyfriend of hers.  And she shot him with a shotgun.  And he died on the way to the hospital if I remember correctly. And she was ruled -- it was ruled self-defense.  She was not convicted, but I was an ear-witness.  I was upstairs and heard everything, so they brought me into court as an ear-witness.

App. 755.  Trial counsel did not ask Juror Garner whether this experience would affect his deliberation in Moore's case despite the indication that Juror Garner likely identified with the

victim of the crime because his mother was also involved in an attack involving a gun. It was trial counsel's duty to ask more questions to determine if bias did exist; not doing so was ineffective.

It is well settled that a juror may not serve on a jury if "his opinions would prevent or substantially impair the performance of his duties as a juror in accordance with his oath and instructions." *State v. Green*, 301 S.C. 347, 352, 392 S.E.2d 157, 159 (1990) (citing *Witt*, 469 U.S. 412). This principle has been widely recognized as necessary to protect the rights of defendants. *See United States v. Martin*, 749 F.2d 1514, 1517 (11th Cir. 1985) (finding a bank teller who was equivocal about whether she could put aside her experiences should be excluded from a bank robbery trial); *Sims v. United States*, 405 F.2d 1381, 1384 n.5 (D.C. Cir. 1968) (finding a taxi cab driver should be excluded from a jury in a trial for the murder of a taxi cab driver); *Williams v. Commonwealth*, 453 S.E.2d 575, 577 (Va. App. Ct. 1995) (finding a prison guard excluded from trial for assault of a prison guard). In light of these cases, trial counsel was ineffective in failing to uncover potential juror bias in *voir dire*.

**III.    Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Pursue a *Batson v. Kentucky*, 476 U.S. 79 (1986), Claim After the State Struck the Only Two African-American Jurors Qualified to Serve on the Jury.**

Moore was denied the right to effective assistance of counsel when trial counsel failed to pursue a *Batson* claim, despite the fact that the State struck the only two African Americans qualified to serve—potential jurors Douglas Alexander and Joyce Morrow. A *Batson* challenge proceeds in three steps. *See Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (*Miller-El II*).

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

23

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (alteration in original) (quoting *Miller-El II*, 545 U.S. at 277) (internal quotation marks omitted).  Evidence of purposeful discrimination can be demonstrated by showing the State's proffered reasons were pretextual because similarly situated white jurors were seated on the jury, disparate questioning of white and African American jurors by the State, and other evidence that demonstrates purposeful discrimination.  *See Miller-El II*, 545 U.S. 231.  The State's decision in this case to strike the only two qualified African-Americans established a prima facie case of racial discrimination.  App. 1135, 1765.  Trial counsel raised a *Batson* challenge, but abandoned the challenge after the State presented allegedly race-neutral reasons for striking the jurors, without challenging the reasons as pretextual or other evidence of purposeful discrimination.

The State struck potential juror Douglas Alexander, a 53-year old African-American male. The State's proffered race-neutral reasons for striking Juror Alexander were (1) that his son was prosecuted for murder by the same office that was prosecuting Moore and (2) that he misunderstood one of the judge's questions and was the only juror who misunderstood that question.  App. 1136.  The State claimed they did not want a jury member who had a son incarcerated for murder because Moore "is also somebody's son" and that they also struck potential juror Edward Huffman, a white juror, who also had a close relative who was prosecuted for murder.  App. 1136.  Without any argument, trial counsel then dropped their *Batson* challenge, stating "we can't argue with the State."  App. 1137.  Trial counsel was ineffective in withdrawing the *Batson* challenge because there was available evidence that Juror Alexander was stricken on the basis of his race.

First, the State failed to strike or object to several white jurors who had relatives that were similarly prosecuted.  Jurors Michael Garner, Karen Nave, and Susan Hardison all had relatives

who were prosecuted for various crimes.  Juror Garner's mother was prosecuted for murder and his cousin was prosecuted for drug possession.  App. 754-56.  Juror Nave's brother was also prosecuted for drug possession.  App. 502.  Juror Nave expressed animosity toward her brother for having gone to jail multiple times.  App. 502.  Juror Hardison's relative pled guilty to a crime; however, the State did not even ask Juror Hardison to specify the nature of the crime.  App. 358-59.  These white jurors were similarly situated to Juror Alexander and were not stricken by the state, demonstrating the pretextual nature of the State's stated race-neutral reasons for striking Juror Alexander.

Review of the State's *voir dire* questioning further reveals disparate questioning by the State of the black and white potential jurors.  Upon seeing that Juror Alexander's juror questionnaire indicated his son had been charged with murder, the State asked many questions about the resolution of the case against his son.  App. 374.  In contrast, the State did not even ask Juror Hardison to specify her relative's offense.  *See* App. 358.  Had the State truly been concerned about the prosecution of jurors' relatives, the State would have asked similar questions of both Juror Alexander and Juror Hardison.  *See Miller-El v. Cockrell*, 537 U.S. 322, 344 (2003) (*Miller-El I*) ("[T]he differences in the questions posed by the prosecutors are some evidence of purposeful discrimination.")

The second reason the State provided for striking Juror Alexander—that he misunderstood a question from the judge that no other juror misunderstood—is clearly pretextual, demonstrating discrimination based on race.  The only question Juror Alexander arguably misunderstood was when the judge asked: "Could you listen to the law, accept and apply that law as I would instruct you as the judge of this Court even though you may disagree with that law or think that it should be some other way?"  App. 364.  Juror Alexander did not say he did not understand the judge;

instead he asked a clarifying question: "Do you mean whether I agree or disagree with it?"  App. 364.  The judge clarified, "Would you be able to follow the law even though you disagreed with it?"  App. 364.  To which, Juror Alexander stated: "Oh, yeah."  App. 364.  The judge asked him again, "You would follow my instructions?"  app. 364, and Juror Alexander unequivocally stated, "Yes, I would."  App. 364.  A reading of Juror Alexander's responses demonstrates that he did not misunderstand the question; he merely sought clarification to ensure he answered the exact question the judge asked of him.  Additionally, the State was incorrect in stating that no other juror misunderstood that question.  In response to the same question, potential juror Michael Willingham told the judge he did not understand the question twice, app. 806, and potential juror Jeff Fortner asked the judge to repeat the same question during his *voir dire*.  App. 823.  The State had an opportunity to strike both Juror Willingham and Juror Fortner, but did not do so.  App. 1765.  It is thus clear that the State's second reason for striking Juror Alexander was pretextual and trial counsel was ineffective in failing to make such an argument at trial.

The State also struck potential juror Joyce Morrow, a 51-year old African-American female.  The State claimed they struck Morrow because (1) she withheld information regarding her criminal record, (2) she believed as a general matter that "guns were improperly used," which the State deemed problematic if the victim were armed, and (3) she was a teacher who wanted to switch to another jury term until she learned she would have to miss her vacation if she was scheduled for another term.  App. 1135-36.  Trial counsel did not challenge any of the State's reasons despite grounds to do so.  First, another white juror, Stacy Gantt, was similarly situated in that she failed to provide truthful information regarding her criminal record.  App. 903-04.  Nevertheless, Juror Gantt was seated as an alternate juror.  Similarly, Juror Sandra Taylor, a white female, also expressed concern about serving on the jury, but was seated on the jury.  *See* App.

845-46.  Furthermore, a reservation in wanting to sit on a jury based on missing work is not uncommon for potential jurors.  The Supreme Court has held that this is precisely the type of reasoning that may be pretextual because it is common to many jurors.  *See Snyder,* 552 U.S. at 479-80 (finding pretext where a juror was struck due to his hesitance to serve on the jury because of his teaching obligations because a significant number of venireman expressed similar concerns).  These similarly situated jurors demonstrate that the race-neutral reasons advanced by the State were pretextual.

Trial counsel were ineffective in failing to raise these arguments readily available in the trial record.  Moreover, trial counsel's performance was prejudicial.  But for the errors of counsel, there is a reasonable probability that the court would have found the State's proffered reasons for striking the jurors pretextual, meaning that Moore would have prevailed on a fully-argued *Batson* motion and have been tried by a different jury.  Furthermore, had trial counsel at least preserved their *Batson* claim for direct appeal, there is a reasonable possibility that an appellate court would have found the prosecution's proffered race-neutral reasons for striking the jurors to be pretextual, requiring Moore to be granted a new trial.  *Batson*, 476 U.S. at 100.

**IV.  Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Challenge the State's Decision to Seek the Death Penalty as Arbitrary and Disproportionate to the Crime with Which He was Charged.**

The Supreme Court has repeatedly affirmed that "the death penalty is reserved for a narrow category of crimes and offenders," *Roper v. Simmons*, 543 U.S. 551, 569 (2005)—for the "worst of the worst."  Similarly, the death penalty cannot be imposed in an arbitrary manner under the Eighth Amendment.  *See Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).  This worst of the worst principle influenced the Court to conclude that the death penalty was not disproportionate in all cases because while "[i]t is an extreme sanction, [it is]

suitable to the most extreme of crimes." *Gregg*, 428 U.S. at 187. The Court has made clear on a number of occasions that capital punishment should be "reserved for those crimes that are 'so grievous an affront to humanity that the only adequate response may be the penalty of death.'" *Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008) (quoting *Gregg*, 428 U.S. at 184).

The commitment to reserve capital punishment for the "worst of the worst" conversely is intended to prevent "average murderers" from being sentenced to death. For this reason, the Court "has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002); *see also Enmund v. Florida*, 458 U.S. 782, 797 (1982) (prohibiting the imposition of the death penalty for felony murder where the defendant did not kill, attempt to kill, or intend to kill); *Coker v. Georgia*, 433 U.S. 584 (1977) (prohibiting the imposition of the death penalty for the rape of an adult woman). The requirement that a state prove an aggravating circumstance before a defendant is even eligible to be sentenced to death is intended to provide the required narrowing and reserve the sentence for only the worst or most extreme murders. It is not enough that an aggravating circumstance "genuinely narrow the class of persons eligible for the death penalty," it must also "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). As a result, the Court has invalidated aggravating circumstances broadly defined to allow the imposition of the death penalty upon a defendant whose "crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

Moore's case epitomizes the disproportionate and arbitrary application of the death penalty the Supreme Court has found in violation of the Eighth Amendment. Moore was charged with the relatively unaggravated crime of murder and armed robbery. Significantly, no real argument can

be made that Moore entered Nikki's with the intent or ability to kill the clerk. He did not bring a gun into the store and the clerk produced two guns from his side of the counter. All indications are that this was, at most, a strong armed robbery where the clerk attempted to ward off the robber and a struggle occurred over the weapon. Both parties fired at each other and both parties were shot, indicating a gun battle between the two. Unfortunately, the clerk died from his wounds, but that does not raise this crime to one so depraved as to warrant the death penalty. It certainly does not make it "materially more 'depraved' than that of any person guilty of murder." *See id.*

These principles are demonstrated by the fact that similar crimes generally result in a sentence of life imprisonment or less. In fact, undersigned counsel were unable to find any similar case—one in which a robbery was alleged to commence without the robber having a weapon and ultimately resulting in the death of the person being robbed—that resulted in a death sentence. Most illustrative is the case of Kevin Eugene Briggs who committed a string of robberies in 1999 targeting the Hispanic community in the same judicial circuit where Moore was prosecuted. Tom Langhorne, *Man Pleads Guilty to Voluntary Manslaughter; Receives 30 Years in Prison*, GOUPSTATE.COM     (Apr.     10,     2001),     *available     at* http://www.goupstate.com/article/20010410/NEWS/104100326. The evidence in Briggs' case revealed that Briggs went to the home of Guadalupe Bautista intending to rob the house carrying a gun. *Id.* Bautista attempted to wrestle the gun away from Briggs during the robbery and Bautista was shot in the head and died. *Id.* Roughly six months before Moore's trial, while Moore remained in pretrial detention, Seventh Circuit Solicitor Gowdy and Briggs entered into an agreement that allowed Briggs to plead guilty to voluntary manslaughter and received a sentence of 30 years in prison. *Id.* In direct contrast, Moore did not bring a gun to Nikki's, a struggle occurred over the

victim's gun, and both the clerk and Moore were wounded.  The resolution of Briggs' case unmistakably demonstrates the disproportionality of Moore's death sentence.

In light of this readily available evidence that a death sentence against Moore would be disproportionate and demonstrated an arbitrary application of the State's death penalty statute, trial counsel were ineffective in failing to challenge the solicitor's decision to seek the death penalty. Had trial counsel filed a pretrial motion to bar the death penalty as disproportionate and arbitrary, there is a reasonable probability the trial court would have barred the State from seeking the death penalty against Moore and Moore would not be facing the imposition of a death sentence now. *See Strickland*, 466 U.S. at 687.

**V.     Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Adequately Investigate and Present Mitigating Evidence.**

Moore was born in 1965 in Mount Clemens, Michigan, a small city approximately thirty miles from Detroit.   He was the sixth child, out of eight children, born to Maurice and Anna Moore.  Maurice and Anna both grew up in the South, but moved to the Detroit area in the 1950s with their families along with many other African American families who moved north to Detroit seeking jobs in the auto factories around the same time.  When Moore was born and growing up, the family lived on North Walnut Street in a predominantly black neighborhood within Mount Clemens.  The family lived right next door to Moore's maternal grandparents and just around the corner from a park where the neighborhood children played sports like basketball, football, and baseball.  Both of Moore's parents worked in the auto factories around Detroit; Moore's father often picked up extra shifts to support his large family.

Because Moore's parents worked so much, Moore's older siblings often took care of him and the younger siblings.  Moore's oldest brother is ten years older than Moore and looked after

Moore and his younger siblings often.  Moore's father was a quiet man who was generally disinterested in things going on with his family.  For example, Moore's father did not attend the sporting events of Moore or the other children and did not even ask the children about the results of their sporting events.  As a result, Moore found a father figure in his maternal grandfather who lived next door.  Moore began hunting and fishing with his grandfather when he was between ten and twelve years old.  The grandfather's house served as a gathering place for many people in the neighborhood who would spend time in the grandfather's garage drinking alcohol and smoking marijuana.  From the time Moore started hunting and fishing with his grandfather, his grandfather gave Moore alcohol.  This was Moore's first exposure to drugs and alcohol—around age ten or twelve.

Moore was first introduced to marijuana around age twelve or thirteen and during middle school, Moore and many of his neighborhood friends smoked marijuana daily.  His older siblings smoked marijuana in the basement of their house or around the neighborhood.  Moore and his sister Cynthia, who was closest to him in age, started using marijuana because all of their older siblings were smoking it and it seemed like the whole neighborhood was as well.  Moore and his friends were able to obtain marijuana in the neighborhood, especially in the park around the corner from Moore's house where he played as a child.  The park was a place where drug dealers would set up and sell drugs.  The drug dealers and older people in the park often shared drugs like marijuana with the younger children in order to introduce them to the drugs.  The park became a place that corrupted the children, including Moore and his peers.

Moore attended school and graduated on time in 1983.  However, he graduated with a GPA just high enough to pass and was ranked near the bottom of his class.  After high school, his parents expected that he would obtain a job in a factory around Detroit like they had.  Around the same

time, in the early 1980s, crack made its appearance in Detroit and the surrounding areas. Mount Clemens was effected in a particularly extreme way because it became a popular place for crack sales and purchases as it was perceived as safer than downtown Detroit or on 8 Mile Road, a notoriously violent road that served as a dividing line between the city of Detroit and the suburbs. As a result, dealers sold crack to passing cars on Moore's street, North Walnut, on street corners throughout the neighborhood, and in the park near Moore's house. Moore became addicted to crack soon after he tried it during his late teenage years.

As a young adult, Moore's addiction set his life on a cycle that repeated over and over again. Moore initially had enough money to purchase drugs because he was working at a plant near Mount Clemens. However, due to his addiction he became unable to hold a job and began committing thefts in order to support his addiction. Moore was arrested multiple times for unarmed burglaries and robberies while still living in Michigan. For many of his convictions, Moore received only probation; for others, he served short jail or prison sentences. Moore's incarcerations were the only times he was able to remain sober as an adult. Moore never received drug treatment during his periods of incarceration[6] and very soon after he returned to the town of Mount Clemens, filled with his friends and siblings who were still using drugs and readily accessible crack and other drugs, Moore began using again. As a result, Moore became caught in a cycle of using, committing robbery, being incarcerated, and beginning to use again.

Around 1990, Moore met Lynda Byrd. The two began communicating while he was incarcerated on a parole violation for failing a drug test. Byrd received an offer to move to South Carolina with the company she worked for that was opening an office in Spartanburg. Byrd and

---

[6] Moore was ordered by the probation office to partake in drug treatment after one of his offenses; however, after a very short time in treatment, Moore sprained his ankle and was forced to discontinue his treatment.

Moore decided to move together to Spartanburg after knowing each other a short time. Moore and Byrd saw this as an opportunity for a fresh start. Byrd thought it would help Moore to be out of the Mount Clemens community where his friends and family were still using drugs and committing crimes. At first, it seemed like the fresh start worked for Moore. However, crack was readily available in Spartanburg, especially the Whitney community where Moore and Byrd lived. Moore's addiction soon overrode his fresh start and Moore's cycle of addiction and incarceration began anew in South Carolina. Eventually, this cycle resulted in the death of the Nikki's store clerk and Moore's death sentence.

Janis Whitlock, Ph.D. is a professor at Cornell University in the Human Development department. She has a doctorate in developmental psychology and is an expert in adolescent development and the effects of the community on that development. Dr. Whitlock has reviewed all of the mitigation testimony presented at trial and in PCR, Moore's school and criminal history records, and information regarding his family and community in Mount Clemens. Dr. Whitlock has opined that Moore had a strong attachment to his family and peers, which generally meets the developmental needs of children as they grow. However, in Moore's case, his strong attachments were to his family and peers who introduced drugs into his life—first, his grandfather introduced him to alcohol, his brothers introduced him to marijuana, and then his friends introduced him to crack. Moore's family had a general acceptance of drug use, which made him particularly receptive to taking part in this drug culture. In the 1980s crack use became widespread among Moore's peers and was easily accessible and affordable. Moore and many of his peers in the community became addicted to crack before recognizing its dangers, both in terms of physiological effects and addictiveness. This was particularly true because other drug use was so widespread with few negative effects. Moore and his peers did not find marijuana and alcohol to be harmful

or fatal, and did not know to expect that from crack. Dr. Whitlock has also opined that Moore's drug addiction, in large part, contributed to and explained Moore's criminal behaviors.

Additionally, Dr. Whitlock found that Moore's upbringing in a community dominated by drug dealing and usage would affect the way he reacted when the clerk pointed a weapon at him. In Moore's community, he and his peers were taught to stand up for themselves and never back down. As a young person, Moore learned that the expectation was to stand his ground when confronted physically or by an insult. Dr. Whitlock indicated that Moore learned this from his community and within the home. Moore's father played a very typically masculine role in the family and used corporal punishment on the children, which contributed to Moore's belief that, as a man, he was supposed to protect himself and not back down from confrontation. In this way, Moore's upbringing explains why, when the clerk produced a gun at the store, Moore would attempt to get the gun away from the clerk and use it to protect himself.

Moore's trial counsel did not present any of this evidence. Instead of explaining Moore's life and the community in which he grew up, Moore's trial counsel ignored the fact that Moore had a serious drug addiction and an extensive criminal history. Trial counsel's mitigation presentation of just two witnesses who said Moore was a good father when he was around did nothing to explain the circumstances that led Moore to that point in his life. Undersigned counsel interviewed over twenty members of Moore's family and friends who would have testified to the devastating effects of Moore's upbringing in his Mount Clemens neighborhood. Trial counsel never contacted the vast majority of these witnesses, never traveled to Michigan to conduct a mitigation investigation, and did not investigate Moore's drug use and social history in any significant way. The jury was, therefore, left with no context with which to explain Moore's behaviors and to understand that Moore could function well in a controlled environment like

34

prison.  Trial counsel were ineffective in failing to investigate and present this readily available

mitigation evidence to the jury.  Moore was prejudiced by this failure because, had trial counsel

presented this type of mitigation evidence, it "might well have influenced the jury's appraisal of

[Moore's] moral culpability."  *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

**VI.    Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Present Evidence of Petitioner's Adaptability to Life in Prison from James Aiken, a Nationally Recognized Expert, Who was Prepared and Available to Testify on Moore's Behalf.**

At the sentencing phase of Moore's trial, the State presented substantial testimony

regarding Moore's past crimes and his future dangerousness.  The State called multiple clerks of

court to testify to Moore's criminal record, two women who had previously been robbed by Moore,

and a parole officer from Michigan who had interviewed Moore for a pre-sentence report in a prior

case.  Trial counsel did not call a single witness to rebut or explain any of the State's criminal

history or future dangerousness evidence.  This failure, however, was not for a lack of witnesses

willing to testify on behalf of Moore.  James Aiken, an expert on prison systems and inmate

classification in South Carolina and across the United States, was prepared and willing to testify

on behalf of Moore.  After serving as the warden for two prisons in South Carolina, Aiken became

the Deputy Regional Administrator of sixteen prisons in South Carolina.  App. 2099.  He left that

position to become the Commissioner of Corrections for the whole of the Indiana Department of

Corrections.  App. 2099.  After that, he became the Director of Corrections for the U.S. Virgin

Islands.  He then began a private consulting firm for jails and prisons. App. 2099.  Throughout his

career he also consulted with the United States Department of Justice on prison security and the

management of violent inmates.  App. 2100.

Although Aiken had reviewed Moore's records and was prepared to testify on his behalf

during sentencing, trial counsel did not call him to testify.  App. 2098.  At the PCR hearing, Aiken,

who has classified thousands of inmates, testified that based upon Moore's records, Moore could be "adequately managed while in confinement." App. 2112. Aiken based this evaluation on Moore's "institutional history, his behavior patterns, and how those behaviors have been adequately managed not only in a jail environment, but also in a prison environment." App. 2112. Aiken discussed Moore's minor infractions while in prison (using improper language, ignoring directives, possessing a cellphone), and noted that Moore had no in-prison charges of assault on prison staff, possession of a weapon, or gang activity. App. 2126-27. Aiken concluded that Moore did not "come anywhere near the level of predator inmate population and the intensive type of management that's required for that type of population." App. 2127. Aiken stated that he would have testified to Moore's adaptability to prison had he been called by trial counsel. App. 2127.

At the PCR hearing, trial counsel were unable to articulate any reasonable strategic reason not to have called Aiken. Trial counsel Morin admitted that if Aiken had testified that Moore's prison infractions while in South Carolina were "minor" and if Aiken "could explain it away" then Aiken's testimony "would have been helpful." App. 2499. Trial counsel Kelly recognized that he knew that Aiken's testimony would have reflected positively on Moore:

> Kelly:    [H]is testimony was going to be along the lines of no matter what, we had a place that we can make the population safe by, by housing Mr. Moore and without Mr. Moore, you know, getting the death penalty. In other words, he's never gonna get out and we can control him. He's not a monster. He's not uncontrollable.

App. 2649-50. Such testimony would clearly be in line with trial counsel's strategy during sentencing of showing that Moore was "life eligible." *See* App. 1730. Kelly's rationale for not having Aiken testify was that trial counsel did not want any of Moore's prison infractions to come into the record. Kelly stated that the prosecution had brought in a witness from Michigan to testify to Petitioner's infractions there. However, when Kelly was asked if he could recall a single example of an infraction he wanted to keep out, he was unable to do so. App. 2650-51.

36

In denying this claim, the PCR court concluded that trial counsel's failure to call Aiken was not prejudicial because Aiken's testimony would have been "of slight value" and "it would have permitted the introduction of evidence that would be damaging to the defense's case in mitigation." App. 2975. This is was wrong on both accounts, and the failure to call Aiken prejudiced Moore.

First, Aiken's testimony would have been valuable to Moore. Aiken was exceedingly experienced in prison systems, South Carolina's in particular, and had reviewed the files of thousands of inmates. This experience alone would have lent significant credibility to his testimony. Additionally, the jury heard minimal mitigation evidence. They heard only from two defense witnesses, neither of whom were experts. The Supreme Court has held that jurors might draw "favorable inferences" from testimony reflecting positively on a defendant's "probable future conduct if sentenced to life in prison." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Had the jury been able to hear mitigation evidence from an expert there is a reasonable probability that at least one juror would have voted to impose a life sentence. *See Wiggins*, 539 U.S. at 537 (noting that where trial counsel presents minimal mitigation, and ignores available mitigation evidence, there is "a reasonable probability that at least one juror would have struck a different balance" had they heard the mitigation evidence).

Second, having Aiken testify could not have "damaged" Moore's mitigation case. Evidence of a defendant's conduct while incarcerated is admissible by the State in order to show inadaptability to prison life or future dangerous, regardless of the defense's mitigation presentation. *See Skipper*, 476 U.S. at 5. Therefore, whether Aiken testified was irrelevant to whether the State could introduce any records of Moore's past prison infractions. Thus, trial counsel was ineffective because their failure to call Aiken was not the result of reasonable strategy

and had the jury heard Aiken's testimony, there is a reasonably probability that the outcome of Moore's sentencing would have been different. *See Strickland*, 466 U.S. at 687.

**VII.    Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Request a Charge on the Statutory Mitigating Circumstance of Provocation by the Victim as Set Forth in S.C. Code Section 16-3-20(C)(b)(8).**

South Carolina law provides that a jury may consider as a statutory mitigating circumstance that "[t]he defendant was provoked by the victim into committing the murder." S.C. Code § 16-3-20(C)(b)(8). A mitigating circumstance "must be submitted [by the trial court] for the jury's consideration" when it is "supported by the evidence." *State v. Bowman*, 366 S.C. 485, 494, 623 S.E.2d 378, 383 (2005). In South Carolina, prior to instructing the jury in the penalty phase of a capital trial, the "trial judge must make an initial determination of which statutory mitigating circumstances have evidentiary support." *Id.* After that determination is made, the defendant is allowed "to request any additional statutory mitigating circumstances supported in the record." *Id.*

In this case, there was undisputed evidence that the victim drew a gun on Moore while Moore did not have a gun of his own. *See* Ground I, *supra*. All three guns that were in Nikki's the night of the crime belonged either to the store owners or to the victim himself. The State presented no evidence that Moore acted violently or threatened the store clerk before the clerk pulled a gun from behind the counter. Thus, there was evidence that the clerk acted first, provoking Moore into gaining control of the gun. Additionally, there is undisputed evidence that the clerk pulled another gun from his waist band. The clerk fired at least one shot at Moore, who was shot in the shoulder. This provides ample evidentiary support for the mitigating circumstance of provocation by the victim. Trial counsel was ineffective in failing to request this mitigating circumstance be charged to the jury. Had the jury considered this circumstance, there is a

reasonable probability at least one juror would have struck a different balance between life and death.  *See Wiggins*, 539 U.S. at 537.

**VIII.  Moore's Rights to Due Process and the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were Violated Due to Trial Counsel's Failure to Object to the Application of the Aggravating Circumstances (1) that the Murder was Committed While in the Commission of Armed Robbery as Set Forth in S.C. Code Section 16-3-20(C)(a)(1)(e) and (2) that the Murder was Committed for the Purpose of Receiving Money.**

A death sentence may not be imposed unless the sentence finds at least one aggravating circumstance beyond a reasonable doubt.  S.C. Code § 16-3-20(C); *State v. Riddle*, 301 S.C. 68, 70, 389 S.E.2d 665, 666 (1990).  In Moore's case, the trial court instructed the jury to consider three aggravating circumstances: (1) murder while in commission of armed robbery, (2) the act created a great risk of death to more than one person, and (3) murder for the purpose of receiving money.  App. 1136-37.  Trial counsel did not challenge any of the aggravating circumstances, despite the fact that two were not supported by the evidence presented at trial.  Trial counsel was ineffective in failing to object to the aggravating circumstance of murder committed while in commission of armed robbery because there was no evidence that Moore had any intention to commit a robbery until after the clerk was already dead.  South Carolina Code Section 16-3-20(C)(a)(1)(e) allows for a death sentence when "[t]he murder was committed *while in the commission* of . . . robbery while armed with a deadly weapon."  The "while in the commission of" language requires proof that the act of armed robbery and the act of murder "are concurrent" with one another.  *State v. Humprhies*, 325 S.C. 28, 33, 479 S.E.2d 52, 55 (1996).  If it is determined that the defendant "was guilty of murder and robbery, but that the murder was not committed 'while in the commission of' the robbery, [the defendant] could not be sentenced to death because the aggravating circumstance would not exist."  *State v. Riddle*, 301 S.C. 68, 74, 389 S.E.2d 665, 668 (1990) (Toal, J. concurring).

Here, the State presented no evidence that Moore committed murder *while in the commission of* armed robbery. The State presented evidence that Moore shot at the clerk and that he took money from the store after he shot the clerk. However, there is no evidence that Moore had the intent or motive of committing robbery when he shot the clerk. The only witness to the crime, Hadden, never heard Moore demand money from the clerk nor did he testify that he saw anything consistent with a theory that Moore entered the store with the intent to rob it. *See* App. 1205-11. The only evidence of a robbery is that after he had been shot by the victim and had shot the victim, Moore walked behind the counter and took money sitting in plain view on a desk. *See* App. 1352. Thus, there was no evidence to support an aggravating circumstance that he committed murder *while in the commission* of armed robbery. Similarly, there was no evidence that Moore committed the murder "for the purpose of receiving money or a thing of monetary value." *See* S.C. Code § 16-3-20(C)(a)(4). With no evidence that Moore ever intended to take money until he saw the money after the clerk had already been shot, there was no evidence to demonstrate that the murder was for the purpose or receiving money. Given the facts of the case, trial counsel was ineffective in failing to object to the trial court instructing on these two aggravating circumstances. Without these circumstances, it is likely at least one juror would have struck a different balance and voted for life. *See Wiggins*, 539 U.S. at 537.

13. Petitioner has not previously filed any petition, application, or motion in federal court regarding the convictions that he challenges in this petition.

14. Petitioner does not have any petition or appeal now pending in any court for the judgment he is challenging.

15. The names and addresses of each attorney who previously represented Petitioner are as follows:

    (a) At preliminary hearing: Michael D. Morin, 894 W. Saint John St., Spartanburg, SC 29301.

    (b) At arraignment and plea: Michael D. Morin, 894 W. Saint John St., Spartanburg, SC 29301.

(c)    At trial:  Michael D. Morin, 894 W. Saint John St., Spartanburg, SC 29301; The Honorable R. Keith Kelly, 125 E. Floyd Baker Blvd., Gaffney, SC 29340; Jennifer Johnson, Tenth Circuit Public Defender Office, 301 Camson Rd., Anderson, SC 29625.

(d)    At sentencing:  Michael D. Morin, 894 W. Saint John St., Spartanburg, SC 29301; The Honorable R. Keith Kelly, 125 E. Floyd Baker Blvd., Gaffney, SC 29340; Jennifer Johnson, Tenth Circuit Public Defender Office, 301 Camson Rd., Anderson, SC 29625.

(e)    On direct appeal:  Joseph L. Savitz, III, 1825 St. Julian Place, Unit 15-D, Columbia, SC 29204.

(f)    In the state post-conviction proceedings: Initial Petition: Melissa Jane Armstrong, 3213 Amherst Avenue, Columbia, SC 29205 & Kathrine Hudgins, S.C. Commission on Indigent Defense, 1330 Lady Street, Suite 401, Columbia, SC 29201; Amended Petition and Hearing: Melissa Jane Armstrong, 3213 Amherst Avenue, Columbia, SC 29205 & James M. Morton, Morton & Gettys, LLC, PO Box 707, Rock Hill, SC 29731.

(g)    On appeal from the denial of the application for state post-conviction relief: Susan Barber Hackett and Robert M. Dudek, South Carolina Commission on Indigent Defense, Division of Appellate Defense, 1330 Lady Street, Suite 401, Columbia, SC 29201.

16.    (a)    Petitioner has no future sentences to serve.

(b)    Not applicable.

(c)    Not applicable.

(d)    Not applicable.

17.    **TIMELINESS OF PETITION:**  The limitations period calculations with respect to this petition have already been addressed by the Court and the parties, who have agreed that the time for filing the petition prescribed by 28 U.S.C. § 2244(d) expires on August 16, 2015.

WHEREFORE, Petitioner asks that the Court issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint, and grant such other relief as may be necessary and appropriate.

Respectfully submitted,

**CHRISTOPHER W. ADAMS**
Fed. ID # 10595
The Law Office of Christopher W. Adams, P.C.
102 Broad Street, Suite C
Charleston, SC 29401
chris@chrisadamslaw.com
(843) 577-2153

**LINDSEY S. VANN**
Fed. ID # 11872
Death Penalty Resource & Defense Center
900 Elmwood Ave., Suite 101
Columbia, SC 29201
(803) 765-1044
lindsey@deathpenaltyresource.org

BY: s/ Lindsey S. Vann

August 14, 2015.

VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct. Executed by court-appointed counsel for petitioner on August 14, 2015.

BY: s/ Lindsey S. Vann

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

**RICHARD BERNARD MOORE**                    )
                           *Petitioner*,           ) C/A No. 4:14-cv-4691-MGL-TER
                                             )
       v.                                                     ) **DEATH PENALTY CASE**
                                             )
**BRYAN P. STIRLING,** Commissioner,          )
South Carolina Department of                    )
Corrections, and **JOSEPH MCFADDEN**,    )
Warden of Lieber Correctional Institution     )
                             *Respondents*.          )
_____)

CERTIFICATE OF SERVICE

I, Lindsey S. Vann, hereby certify that I have this date served the Petition for Writ of Habeas

Corpus by a Person in State Custody in the above-captioned case upon counsel for respondent via

ECF.

                                               s/ Lindsey S. Vann


August 14, 2015.